1   Edmundo P. Robaina
    ROBAINA & PALOMINO, P.C.
2   One East Camelback Road, Suite 300
    Phoenix, Arizona 85012
3   State Bar No. 018125
    (602) 277-9791
4   epr@robainalaw.com

5   Attorneys for Plaintiff Maria Denise Menchaca

6              **UNITED STATES DISTRICT COURT**

7                  **DISTRICT OF ARIZONA**

8   Maria Denise Menchaca,              )   NO. CV07-01970-GMS
                                        )
9              Plaintiff,               )   **PLAINTIFF'S RESPONSE TO**
                                        )   **DEFENDANT'S MOTION FOR**
10  v.                                  )   **SUMMARY JUDGMENT**
                                        )
11  Maricopa Community College District,)
                                        )
12             Defendant.               )
    _____    )

13

14         Plaintiff Maria Denise Menchaca ("Plaintiff") hereby responds to Defendant

15  Maricopa County Community College District's Motion for Summary Judgment.

16  Plaintiff's Response is supported by the following Memorandum of Points and

17  Authorities and Plaintiff's Controverting Statement of Facts (hereinafter PSOF).

18            **MEMORANDUM OF POINTS AND AUTHORITIES**

19  **I.      FACTUAL BACKGROUND**

20      **A.    Plaintiff's Employment and Traumatic Brain Injury**

21         Plaintiff began her employment with Maricopa County Community College

22  District ("Defendant") as a residential faculty member in August of 1990. [DSOF ¶ 1] In

23  December of 1991, while employed with Estrella Mountain Community College, Plaintiff

24  was involved in a head-on automobile collision which caused her to suffer a traumatic

25  brain injury ("TBI") specific to the frontal lobe, and involving axion sheering.[1] [PSOF ¶¶

26  _____

           [1] Axions are the connections between nerves.  [PSOF ¶ 32]

                                    1

1-2] Plaintiff was placed on industrial leave until August 16, 1992, during which time she underwent surgery, as well as inpatient and outpatient neurorehabilitation. [PSOF ¶ 3]

Over time, much of Plaintiff's cognitive ability returned and she was able to return to work full-time in August of 1992. [PSOF ¶ 4]  As discussed in detail in Section II.A.1, below, however, as a result of her TBI, Plaintiff suffered, among other things, permanent organizational and emotional control deficits. In addition, Plaintiff suffered Post Traumatic Stress Disorder ("PTSD") for which she was referred for treatment with a psychologist named Dr. C. Brady Wilson in November of 2002. [PSOF ¶ 7]

**B.     Plaintiff's Nonrenewal; The Parties' Settlement Agreement; And The Effects Of The TBI And PTSD**

On or about May 23, 1993, Defendant informed Plaintiff that her probationary contract would not be renewed. [PSOF ¶ 8]  As a result, in August of 1993, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission. [PSOF ¶ 9]  Thereafter, the parties entered into a Settlement Agreement and Defendant rescinded the non-renewal effective May 24, 1994. [PSOF ¶ 10]  Plaintiff then returned to work for Defendant as a faculty member at Glendale Community College. [PSOF ¶ 11]

In the May 16, 1994 Settlement Agreement, Defendant acknowledged Plaintiff's "closed head injury" and PTSD, and agreed to provide Plaintiff with a vocational rehabilitation counselor (or job coach) for nine months. [PSOF ¶ 12]  Defendant also agreed to engage in a good faith effort to place Plaintiff in another area should the need arise because of Plaintiff's "disability." [PSOF ¶ 13]

Pursuant to the Agreement, for approximately one year Plaintiff's job coach met with her almost weekly, and periodically with both Plaintiff and her department chair. [PSOF ¶ 14]  The job coach discussed with Plaintiff her activities and their outcomes; helped her organize her work; and helped her with her decision making skills, communication skills and self awareness. [PSOF ¶ 15]  Plaintiff also continued to see Dr.

2

1   Wilson. [PSOF ¶ 16]

2          In 1995, Plaintiff transferred to Gateway Community College ("GCC") [DSOF ¶

3   8] There, with Dr. Wilson's continuing assistance, Plaintiff was able to perform the

4   functions of her counselor position. [PSOF ¶ 18]  Indeed, in Plaintiff's June 25, 1996

5   evaluation, it was noted that, among other things, Plaintiff is "mature," "very

6   resourceful," and "highly competent."  [PSOF ¶ 19]  Also in early 1996, with Dr.

7   Wilson's  assistance, Plaintiff was also able to complete the dissertation for her doctoral

8   degree from Harvard University.[2]  [PSOF ¶ 20]

9          As a result of Plaintiff's apparent progress, Dr. Wilson stopped seeing Plaintiff in

10  June of 1996. [PSOF ¶ 22] Thereafter, Plaintiff's performance was never formally

11  evaluated, she was never disciplined in any way, and she was never asked to submit to

12  any kind of medical evaluation. Plaintiff did, however, exhibit many TBI and/or PTSD-

13  related inappropriate behaviors in both her personal and professional life. [PSOF ¶ 23]

14         Dr. RaNae Healy worked in the counseling department with Plaintiff for

15  approximately nine years and served as the department chair, and Plaintiff's supervisor,

16  from 2000 to 2005. [PSOF ¶ 25]  Dr. Healy noted that Plaintiff was disorganized and

17  often unprepared for class; had openly yelled at Dr. Healy both as a team member and as

18  department chair; broke down under pressure and stress; appeared unable to monitor her

19  level of speech and tone of voice; was unable to separate her external stressors from the

20  work place, causing her to be unable to focus when family or friends have problems; had

21  difficulty completing tasks; failed to meet deadlines; and had difficulty with

22  organizational skills. [PSOF ¶ 26] Dr. Healy also noted that Plaintiff is a bright person,

23  and that there is nothing wrong with Plaintiff's intellect. [PSOF ¶ 27]

24          Dr. Healy was aware that Plaintiff had been involved in a serious accident and has

25

26
_____
        [2] Plaintiff completed her course work prior to the accident. [PSOF ¶ 21  ]

1  a disability. [PSOF ¶ 28]  As a psychologist with "extensive training with the brain and

2  injuries," she believed that Plaintiff's behavior was "very much" consistent with what she

3  would expect from a severe frontal lobe injury. [PSOF ¶ 29]

4        **C.**     **The Events Of Late 2004**

5       In the Summer and Fall of 2004, Plaintiff experienced significant stress as a result

6  of a series of personal difficulties, including the illnesses of her mother and of a good

7  friend, and the auto accident related death of the family of a student aide. [PSOF ¶ 50]

8       In September of 2004, Dr. Healy advised Plaintiff that some students had

9  complained that Plaintiff had shouted to them and spoken to them disrespectfully in class.

10  Dr. Healy told Plaintiff that she thought Plaintiff "needed to take good look at her

11  disability from the accident and perhaps it was the brain injury that kept getting in her

12  way."  Dr. Healy also discussed with Plaintiff "her inability to monitor herself with

13  others, her loud voice, and her disorganization." [PSOF ¶ 51]  Plaintiff understood that

14  she was not doing well.  She therefore decided to take FMLA leave, during which time

15  she saw a neurologist and began seeing Dr. Wilson again. [PSOF ¶ 52]

16       On or about September 23, 2004, Dr. Wilson wrote a letter to Dr. Healy in which

17  he noted that there had been "a recent exacerbation of [Plaintiff's] previous symptoms so

18  that she presents with significant impairment." Dr. Wilson further wrote that he believed

19  that Plaintiff could resume her position as residential faculty with "appropriate

20  accommodations." [PSOF ¶ 53] Plaintiff was then placed on a reduced leave schedule

21  from September 27, 2004 to January 6, 2005.  [PSOF ¶ 54]

22       On or about December 7, 2004, Dr. Wilson sent a letter to Defendant's Human

23  Relations Department requesting accommodations including a limitation of Plaintiff's

24  teaching load and a job coach or master teacher to assist her with organizing and

25  becoming more aware of student cues or lack of understanding. [PSOF ¶ 55]  On

26  December 30, 2004, Plaintiff submitted an "Application for ADA Accommodation" with

4

1    Defendant in which she listed several possible accommodations. [PSOF ¶ 56]

2        **D.    Accommodations In 2005**

3        On January 10, 2005, Plaintiff met with GCC Dean of Student Services Sylvia

4    Manlove, Associate Dean Carolyn O'Connor and Dr. Healy. [PSOF ¶ 59] Plaintiff told

5    the group that she was ready to return to work full-time. Plaintiff explained, however, that

6    as a result of her TBI, she has difficulty multi-tasking and gets overwhelmed when asked

7    to respond to situations without having ample time to prepare. [PSOF ¶ 60]

8        Plaintiff also told the group that she needed extra time or assistance when planning

9    or organizing the syllabus for a new class and asked for the accommodation of a job

10   coach or master teacher.  She explained that several years before while working at

11   Glendale Community College, she was assigned a job coach and it was very helpful.

12   [PSOF ¶¶ 61-62]  Plaintiff explained what the job coach did, and said that she felt that

13   having a job coach would be a strong component in allowing her to be able to function at

14   the level that they expected of her, as well as to reassure them that she was capable of

15   performing her job the way they would expect. [PSOF ¶ 63]

16       Dr. Manlove told Plaintiff that GCC was not in a position to provide her a with a

17   job coach or master teacher.[3]  Instead, she said, Dr. Healy could provide her weekly

18   specific feedback regarding job performance, deadlines, etc, and it was agreed that

19   Plaintiff's teaching load would be limited to a two credit class and a one credit class for

20   that semester. [PSOF ¶ 65]  Plaintiff knew she needed help, and although she was

21   uncertain as to the adequacy of Dr. Healy's proposed assistance, it was made clear to her

22   that it was this proposal or nothing. She therefore accepted the proposal. [PSOF ¶ 66]

23       Over the next six weeks or so, Plaintiff met with and received feedback from Dr.

24   _____

25       [3] As of June 2006, Defendant possessed cash or cash equivalents of $216,893,832.

26   [PSOF ¶ 64]

5

1   Healy as agreed. [PSOF ¶ 67]  Thereafter, however, Dr. Healy stopped meeting with

2   Plaintiff.  Dr. Healy told Plaintiff that she busy and that Plaintiff was doing fine. [PSOF ¶

3   68]  Plaintiff did, however, continue to see Dr. Wilson frequently, and she responded well

4   to therapy and her medication. [PSOF ¶ 69]  As a result, during this period, Plaintiff's

5   work performance and interactions improved and she became more able to monitor her

6   behavior. [PSOF ¶ 70]

7        Problems reemerged for Plaintiff, however, after a series of stressful events

8   occurred in late  2005. In October, Plaintiff learned that Dr. Healy was unexpectedly

9   being removed as department chair; Then, in November, Plaintiff's mother died; Shortly

10  thereafter, Dr. Healy was transferred, and on January 20, 2006, Denise Bowman became

11  the interim Counseling Department Chair. [PSOF ¶ 72]

12       **E.    The Confrontation With Denise Bowman And The Lead Up To**
           **Plaintiff's Termination**
13

14       On the afternoon of January 23, 2006, Plaintiff met with Bowman and the

15  two discussed changes in the department and Bowman's expectations. [PSOF ¶ 73]

16  Plaintiff left the meeting and later began to consider Bowman's comments regarding the

17  number of hours Plaintiff had worked the prior week. [PSOF ¶ 74] Plaintiff subsequently

18  went back to Bowman's office and a heated discussion ensued.  During the discussion,

19  Plaintiff shouted at Bowman that if she documented her comings and goings and reported

20  it to the administration, she would "kick [Bowman's] ass." [PSOF ¶¶ 75-76]

21       The following morning, on January 24, 2006, Plaintiff wrote Bowman an email

22  apologizing for her behavior. [PSOF ¶ 78]  Late that afternoon, Dean O'Connor wrote an

23  email to HR Coordinator Chrissy Springfield about the incident. Dean O'Connor stated

24  that she felt that "recent changes in the counseling department, as well as [Plaintiff's]

25  inability to emotionally cope with change ... precipitated her behavior." [PSOF ¶ 79] The

26  next day, January 25, 2006, at Dean O'Connor's request, Bowman filed an incident report

6

1    with the Campus Safety Department regarding the January 23, 2006 incident.[PSOF ¶ 80]

2            On January 27, 2006, GCC's Vice-President of Student Services, and acting

3    president, Sylvia Manlove, wrote an email to Defendant's Vice-Chancellor of Human

4    Resources, Al Crusoe, in which she discussed the Bowman incident and noted, in

5    pertinent part, that:

6            In September of 2004 [Plaintiff] was placed on FMLA at her request to deal
             with neurological and psychological issues.  This condition caused her to
7            have emotional outbursts in the classroom and launch verbal attacks on her
             colleagues and department chair.

8            *****

9
             By her own admission, she suffers from a head injury caused by a car
10           accident several years ago that interferes with her job performance.

11   [PSOF ¶ 81]  Dr. Manlove requested that Plaintiff be placed on administrative leave until

12   they could decide about "next steps." [PSOF ¶ 82]  Plaintiff was then placed on paid

13   administrative leave effective January 30, 2006. [PSOF ¶ 83]

14           On January 31, 2006, GCC's president, Dr. Eugene Giovanni sent an email to Mr.

15   Crusoe in which he reiterated the points Dr. Manlove had made regarding Plaintiff's

16   disability.  Dr. Giovanini further wrote: "My recommendation is that [Plaintiff] be placed

17   on unpaid suspension until her termination is acted on at the Governing Boards earliest

18   convenience." [PSOF ¶ 85]

19           Dr. Manlove later testified that the decision terminate Plaintiff's employment was

20   made less than a week after the Bowman incident. [PSOF ¶ 88]  According to Dr.

21   Manlove, the termination was delayed because Dr. Giovaninni "felt [they] needed some

22   documentation from a medical professional to give [Defendant] some...meat...so to speak,

23   to be able to go through with the dismissal." [PSOF ¶ 89]

24           **F.     The Independent Medical Examinations**

25           On or about March 6, 2006, Plaintiff was sent for an "independent medical

26   examination" with a psychologist named Dr. Daniel Blackwood. [PSOF ¶ 90] In response

7

1  to Defendant's question: "Does Dr. Menchaca have a physical or mental impairment that

2  substantially limits one or more major life activities (i.e., working, talking, seeing,

3  hearing, caring for one's self)", Dr. Blackwood reported that "the current test results do

4  not support the presence of any such impairment for Dr. Menchaca." [PSOF ¶ 91]  He

5  went on to write, in pertinent part, however, that:

6       ...Dr Wilson may have some information which pertains to any possible
        psychiatric impairment which Dr. Menchaca may experience.  If there is
7       information to support such impairment, it might point to possible
        accommodations, as well...

8

9   [PSOF ¶ 92]

10      Plaintiff was thereafter sent for a second IME with Dr. Robin Ford.  For purposes

11  of the second IME, Defendant asked Dr. Ford to emphasize or focus on personality

12  attributes. [PSOF ¶ 94]

13       Dr. Ford determined that Plaintiff has a narcissistic personality disorder, which he

14  believes is not a disability under the ADA. [PSOF ¶ 108] He also determined that

15  Plaintiff is unable to develop empathetic relationships with others, and is therefore could

16  not perform the essential functions of her job as a counselor. [PSOF ¶ 113] Dr. Wilson

17  disagrees with Dr. Ford's diagnoses for a number of reasons. [See PSOF ¶¶ 111 and 114]

18      **G.    The Recommendation For Termination; Plaintiff's Appeal and
               Termination**

19

20      On or about September 15, 2006, Defendant's Chancellor, Dr. Rufus Glasper, sent

21  Plaintiff a Notice of Recommendation for Dismissal. [PSOF ¶ 120]  In the Notice, Dr.

22  Glasper cited as reasons for his recommendation that Plaintiff had: a) violated the

23  Workplace Violence Prevention Policy when she shouted to Ms. Bowman that she would

24  "kick her ass"; b) engaged in incidents of "Unsatisfactory and Unprofessional Conduct"

25  in September of 2004, when, after a co-worker informed Dr. Healy and her of student

26  complaints, she was belligerent, began crying and walked out; in December of 2005,

1   when she missed a deadline to complete a report and failed to complete the report; on

2   January 10, 2006, when during a staff meeting she stood up and yelled "I don't want to be

3   a part of this department!"and began to cry; and on January 20, 2006, when she rolled her

4   eyes and walked away when greeted by GCC's President, Vice President of Student

5   Affairs and the Associate Dean of Student Affairs; and c) because the results of the IMEs

6   indicated that she was unfit for duty and thus could not fulfill the duties of her position at

7   GCC.  [PSOF ¶ 121]

8       Pursuant to Defendant's Residential Faculty Policies, Plaintiff thereafter requested

9   a hearing on the matter, which was held on December 1, 2006 and January 9, 2007.

10  [PSOF ¶134]  On or about February 2, 2007, the Hearing Committee issued its Findings

11  of Fact, Conclusions of Law and Recommendation.  In the decision, of which the factual

12  findings and conclusions of law are **binding** upon the parties, the Committee wrote, in

13  pertinent part, as follows:

14      9.  There is conflicting expert testimony to indicate whether Dr.
            Menchaca is unfit for duty and unable to fulfill the duties of her
15          current position.  Dr. Menchaca would be able to fulfill the duties of
            a position of employment at MCCCD with appropriate
16          accommodation.

17      10. The evidence indicates that MCCCD failed to meet its obligations
            under the Americans with Disabilities Act to adequately
18          communicate information regarding Dr. Menchaca's disability to her
            supervisors and to provide Dr. Menchaca appropriate
19          accommodations.

20   [PSOF ¶ ¶ 133 and 135] The committee further made a non-binding recommendation

21  that Plaintiff's termination not be upheld, and that Defendant provide appropriate

22  accommodations that allow Plaintiff to continue employment in the district in some

23  capacity. [PSOF ¶ 137]

24      Despite the Committees, recommendation, on or about February 27, 2007,

25  Defendant's Governing Board upheld the Chancellor's recommendation to terminate

26  Plaintiff's employment. [PSOF ¶ 138]

## II.    Legal Analysis

To establish a prima facie case of discrimination under the ADA, an employee must show that (1) she is a disabled person within the meaning of the ADA; (2) she is a qualified individual, meaning she can perform the essential functions of her position or of a reassignment position; and (3) that her disability was a motivating factor in an adverse employment action. *See Nunes v. Wal-Mart Stores, Inc.,* 164 F.3d 1243, 1246 (9th Cir. 1999); *Dark v. Curry County*, 451 F.3d 1078, 1089 (9th Cir. 2006)(employee is a qualified individual under the ADA if she can perform the essential functions of a reassignment position, even if she cannot perform the essential functions of the current position); and *Head v. Glacier Northwest, Inc.,* 413 F.3d 1053, 1065 (9th Cir. 2005)(the ADA outlaws adverse employment decisions motivated, even in part, by animus based on a plaintiff's disability–a motivating factor standard).

If a plaintiff makes out a prima facie case, the burden shifts to the defendant to provide a legitimate reason for plaintiff's termination. *See McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817 (1973).  If the defendant can provide such a reason, the burden shifts back to plaintiff to show that the stated reasons are merely a pretext for disability discrimination. *Id.*  For the reasons stated below, Defendant's Motion for Summary Judgment should be denied.

### A.    Plaintiff Is "Disabled" Within The Meaning Of The ADA

A "disability" is defined in the ADA as "a physical or mental impairment that substantially limits one of more of the major life activities of such individual," "having a record of such an impairment," or "being regarded as having such an impairment." 42 U.S.C. § 12102(2).  Whether a person is disabled under the ADA is an individualized inquiry. *Fraser v. Goodale*, 342 F.3d 1032, 1039 (9th Cir. 2003).

///

///

10

1
2

**1.    Plaintiff Has An Impairment That Substantially Limits A Major Life Activity.**

3    The ADA does not define "major life activity." *MacAlindin v.County of San*

4  *Diego*, 192 F.3d 1226, 1233 (9th Cir. 1999).  However, the plain meaning of the word

5  "major" denotes comparative importance and suggests that the touchstone for

6  determining an activity's inclusion under the statutory rubric is its significance. *Bragdon*

7  *v. Abbott*, 524 U.S. 624, 118 S.Ct. 2196, 2205 (1998).

8    To be a major life activity, the activity need not have a public, economic, or daily

9  character. *Fraser,* 342 F.3d at 1039. Nor must it be be essential to survival, but rather "of

10  central importance to most people's daily lives." *Head,* 413 F.3d at 1061-62.  A major life

11  activity is a basic activity that the average person in the general population can perform

12  with little or no difficulty. *MacAlindin,* 192 F.3d at 1233.

13    In deciding whether an impairment is substantially limiting, courts consider the

14  nature and severity of the impairment, the duration or expected duration of the

15  impairment, as well as the permanent or long term impact of the impairment. *Fraser,* 342

16  F.3d at 1038.  A person is "substantially limited" in a major life activity if she is

17  significantly restricted as to the condition, manner or duration under which she can

18  perform a particular major life activity as compared to the average person in the general

19  population. *Id.* at 1040.

20    In this case, Dr. Wilson has testified that Plaintiff sustained a permanent physical

21  injury to her brain when the axions in her frontal lobe were sheered during her

22  automobile accident in 1991. [PSOF ¶ 31]  Once sheering occurs, other areas of the brain

23  can take over and address cognitive function. [PSOF ¶ 34]  As such, Plaintiff has the

24  capacity to function as she did before her TBI in regard to problem solving, work,

25  analysis, reading comprehension, and things of that nature. [PSOF ¶ 35]  She does not,

26  however, have the same capacity to address emotional control. [PSOF ¶ 36]

11

1    While most people in common stressful situations have the capacity to either work

2    through or manage their emotions so that they can engage effectively in an activity,

3    Plaintiff, is impaired in that ability. Plaintiff is more engaged in the emotions than she is

4    in the situation. [PSOF ¶ 38]

5    According to Dr. Wilson, as Plaintiff begins to experience feelings in response to a

6    situation, she becomes engaged in the feelings and not to the task.  She cannot organize

7    her thinking, her behavior, or a strategy to address the issue because she becomes entirely

8    engaged with the feelings and trying to manage them. [PSOF ¶ 40]  Thus, Plaintiff often

9    does not respond well to the demands a situation creates for her.  Instead, she responds

10   and engages more with the feelings about the situation: feelings of anxiety, dread,

11   intimidation, fear or anger at the source of the situation. [PSOF ¶ 41]

12   Many times, Plaintiff will simply avoid a situation in order to quiet herself in

13   relationship to the feelings, and so a task will go undone. [PSOF ¶ 42]  At other times,

14   Plaintiff may respond in an angry or hostile manner, or in a manner that gives the

15   impression that she is upset. [PSOF ¶ 43]

16   In addition, Plaintiff is not capable of the same kind of self-monitoring or personal

17   assessment that another person might engage in. [PSOF ¶ 44]  Thus, Plaintiff is

18   impulsive, easily irritated, and she appears to behave in a way that seems more irritable,

19   edgy, or angered because these feelings have a tendency to overwhelm her ability to self-

20   monitor and act appropriately. [PSOF ¶ 45]  When Plaintiff gets "wound up" or "edgy,"

21   the volume of her voice increases significantly and the rapidity with which she speaks

22   increases significantly.  "It's almost as if she drowns herself out to her own ear and

23   speaks so rapidly that she doesn't give herself time to reflect on the content....she's using

24   or the potential consequences of what she might be saying."  [PSOF ¶ 46]

25   According to Dr. Wilson, Plaintiff is impaired in her ability to "interact with life,"

26   meaning that the impact of the TBI and PTSD is pervasive.  That is to say, Plaintiff's

12

1    impairment "effects [Plaintiff's] ability to respond to all conditions, not just specific

2    conditions." "[N]ot only is it going to impact upon her ability to do her work, its going to

3    impact her ability to maintain her relationship[s]....to maintain herself physically, her

4    home, her bills, her life activities. It's not selective." [PSOF ¶ 47] Further, it significantly

5    interferes with her work and personal life one hundred percent of the time. [PSOF ¶ 48]

6           While Plaintiff is permanently and significantly impaired, she is not, however,

7    completely disabled or in a permanent state of agitation.  As Defendant notes, the

8    behavioral effects of the exacerbated TBI may be mitigated by accommodations,

9    supportive treatment and medication. [DSOF 71]

10          Contrary to Defendant's claim, Dr. Wilson has <u>never</u> said that he agrees with Dr.

11   Blackwood that Plaintiff does not have an impairment that substantially limits a major life

12   activity.  In fact, Dr. Wilson has testified that Dr. Blackwood's opinions focus on a

13   different area of assessment than his assessment would as a clinician. [PSOF Disputed ¶

14   70]  According to Dr. Wilson, Dr. Blackwood's evaluation did not address the more

15   integrated functions of the brain in terms of how an individual combines their internal

16   emotional states, their internal cognitive states with the demands of a situation or with the

17   expectations that come from individuals around them, some of the things that actually

18   relate to the symptoms of traumatic brain injury. *Id.* Indeed, as noted in Section I.F,

19   above, Dr. Blackwood wrote in his report that Dr. Wilson could have information which

20   pertains to any possible psychiatric impairment that Plaintiff may experience. [PSOF ¶

21   92]

22          Plaintiff has furthermore never said that in 1996, "the symptoms of [Plaintiff's]

23   TBI or PTSD...went into 'remission,'" as Defendant claims. Nor did Plaintiff complete

24   her dissertation after she stopped meeting with Dr. Wilson in 1996, as Defendant claims.

25   In fact, Plaintiff assisted Plaintiff with the dissertation and did not discontinue his

26   treatment of Plaintiff until after she finished it. [PSOF ¶ 20]

13

1    For all of the foregoing reasons, a reasonable jury could conclude that Plaintiff has

2    an impairment that substantially limits a major life activity.  Summary judgment should

3    thus not be granted in relation to this issue.

4            **2.       Defendant Regarded Plaintiff As Disabled.**

5            Even if Plaintiff were determined not to be actually disabled under the ADA, a

6    reasonable jury could certainly conclude that Defendant regarded Plaintiff as disabled.

7    As noted in Section I.B, above, Dr. Healy has testified that in her opinion, Plaintiff's

8    actions resulted from her TBI.  In addition, Dean O'Connor acknowledged that there was

9    no doubt that Plaintiff had a disability as a result of the TBI. [PSOF ¶ 30]

10           Furthermore, as noted in Section I.E, above, in her January 27, 2006 email to the

11   Mr. Crusoe, Dr. Manlove referred to fact that Plaintiff's "condition caused her to have

12   emotional outbursts in the classroom and launch verbal attacks on her colleagues and

13   department chair," and to the "head injury" that "interferes with her job performance."

14   Dr. Giovannini agreed with Dr. Manlove's assessment and reiterated the language in Dr.

15   Manlove's email in his January 31, 2006 email recommending Plaintiff's termination,

16   which was essentially the only information that Chancellor Glasper read in deciding to

17   recommend Plaintiff's termination. [PSOF ¶¶ 84-86 and 123-128]

18           Defendant's IMEs opinions as to whether Plaintiff is disabled under the ADA are

19   irrelevant in this regard for two reasons: First, they are not qualified to comment on the

20   legal issue of whether Plaintiff is disabled under the ADA. *See Crow Tribe of Indians v.*

21   *Racicot*, 87 F.3d 1039, 1045 (9th Cir. 1996)(Expert testimony is not proper for issues of

22   law because the role of experts is to interpret and analyze factual evidence, not to testify

23   about law).  Second, the label that Dr. Ford placed on Plaintiff's impairment does not

24   change the fact that he believes her to have an impairment that substantially limits one or

25   more major life activities, and that Defendant says, it relied on the IMEs. [PSOF   ] For

26   all of the above-stated reasons, a triable issue of exists as to whether Plaintiff as disabled

14

1   under the ADA.

2       **B.   Plaintiff Is A "Qualified Individual" Pursuant to the ADA.**

3       The ADA defines a "qualified individual" as an individual with a disability who,

4   with or without reasonable accommodation, can perform the essential functions of the

5   employment position that such individual holds or desires. 42 U.S.C. § 12111(8).

6   As noted in Section II, above, an employee is also a qualified individual under the ADA if

7   she can perform the essential functions of a reassignment position, with or without

8   reasonable accommodation, even if she cannot perform the essential functions of the

9   current position. *Dark*, 451 F.3d at 1089.  In considering reassignment as a reasonable

10  accommodation, an employer must consider not only those contemporaneously available

11  positions but also those that will become available with a reasonable period. *Id.* at 1089-

12  90.

13      In this case, a genuine issue of material fact exists as to whether Plaintiff was able

14  to perform the functions of a counselor position at GCC with accommodation.  As noted

15  in Section I.B, above, Plaintiff was able to perform the functions of her job in 1994-95

16  while she had a job coach, and in 1995-96, while she was working closely with Dr.

17  Wilson. Additionally, Plaintiff was able to perform her duties in 2005, while she met with

18  Dr. Healy and saw Dr. Wilson on a regular and frequent basis, as evidenced by the fact

19  that Dr. Healy felt able to stop meeting with Plaintiff, and by the fact that she told

20  Plaintiff that she was doing "fine" in her work.

21      Even if Plaintiff could not successfully perform the essential functions of the

22  counselor position at GCC, however, there is evidence, as the Hearing Committee found,

23  that Plaintiff could have, with reasonable accommodation, performed the essential

24  functions of some position with Defendant. [PSOF ¶¶ 16-19, 67-70, and DSOF 70]

25      Indeed, in at least five counseling positions available at relevant times, crisis

26  counseling was not an essential function of the position. [PSOF ¶ 139] In addition, during

1   relevant times, there were a number of non-counseling positions available for which

2   Plaintiff was qualified. [PSOF ¶ 140 ] Defendant, however, never interacted with Plaintiff

3   regarding those positions. [PSOF ¶ 141]

4          Finally, Defendant exaggerates its concern about the potential danger exhibited in

5   Plaintiff's supposed "threat" to Denise Bowman.  If Defendant is suggesting that Plaintiff

6   poses a "direct threat" to health and safety of others in the workplace, as contemplated in

7   42 U.S.C. § 12113(b), it has the burden of proving it. *Nunes*, 164 F.3d at 1247. Defendant

8   cannot do so because neither its expert, Dr. Ford, nor Drs. Healy or Manlove believe

9   Plaintiff to be a threat. [PSOF ¶¶ 115, 117, and 118] Moreover, Dr. Giovannini never

10  gave the issue any thought one way or the other. [PSOF ¶ 119]

11         If Defendant is not suggesting that Plaintiff is a direct threat, then the question of

12  whether Plaintiff is a qualified individual under the ADA turns on whether Plaintiff could

13  have provided her with an accommodation that would have allowed her to perform the

14  essential function of her job or of another available job for which she was qualified.

15      **C.     Genuine Issues of Material Fact Exist As To Whether Defendant Failed
                to Accommodate Plaintiff's Disability.**

16

17         Under the ADA, the definition of "discriminate" includes "not making reasonable

18  accommodations to the known physical or mental limitations of an otherwise qualified

19  individual with a disability who is an...employee, unless such covered entity can

20  demonstrate that the accommodation would impose an undue hardship on the operation of

21  the business of such covered entity."  42 U.S.C. § 12112(b)(5)(A); *Humprey v. Mem'l*

22  *Hosps Ass'n*, 239 F.3d 1128, 1133 (9th Cir. 2001).  The duty to provide reasonable

23  accommodation is a continuing duty that is not exhausted by one effort. *McAlindin v.*

24  *County of San Diego,* 192 F.3d 1226, 137 (9th Cir. 1999).

25         Liability is appropriate if a reasonable accommodation without undue hardship to

26  the employer would otherwise have been possible. *Humphrey*, 239 F.3d at 1128.

1    Ordinarily, whether an accommodation would pose an undue hardship on the employer is

2    a factual question. *Id.*

3          In this case, as noted above, Plaintiff was able to perform the essential functions of

4    her counseling position while she had a job coach, and when Dr. Healy was providing

5    consistent, specific feedback.  As such, a jury could reasonably conclude, as the hearing

6    committee did, that had defendant continued to provide Plaintiff with a reasonable

7    accommodation such as a job coach, she could perform the essential functions of some

8    position that Defendant had available during relevant times.

9          It is important to note that Defendant does not claim that providing Plaintiff with a

10   job coach and/or transferring Plaintiff to a position that did not require crisis counseling

11   would have posed an undue hardship for it. Moreover, Defendant cannot dispute the fact

12   that a number of positions for which Plaintiff was arguably qualified were available at the

13   time Plaintiff was terminated and/or within a reasonable time thereafter. [PSOF   ]  A jury

14   could reasonably find that Defendant failed to accommodate Plaintiff's known disability.

15          **D.     Defendant Failed To Interact With Plaintiff As Required By The ADA.**

16          Once an employer becomes aware of the need for accommodation, that employer

17   has a mandatory obligation under the ADA to engage in the interactive process with the

18   employee to identify and implement appropriate reasonable accommodations. Humphrey,

19   239 F.3d at 1137.  The employer's obligation to engage in the interactive process,

20   moreover, extends beyond the first attempt at accommodation and continues when the

21   employee asks for a different accommodation or where the employer is aware that the

22   initial accommodation is failing and further accommodation is needed. *Id.* at 1138.

23   Summary judgment is available only where there is no genuine dispute that the employer

24   has engaged in the interactive process in good faith. *Id.* 1137-39

25          In this case, after January of 2005, Defendant's administration did not interact with

26   Plaintiff <u>at all</u> to inquire into accommodations that might allow her to perform the

1    essential function of her counseling position with GCC. [PSOF ¶ 141]  Moreover,

2    Defendant did not discuss with Plaintiff other positions available on its other campuses

3    for which Plaintiff was qualified with or without accommodations. Id.  Summary

4    judgment should therefore not be granted on the issue of Defendant's failure to interact.

5         **E.    Defendant Terminated Plaintiff's Employment Because Of Her
              Disability.**

6

7         In order to prevail in an unlawful discharge case under the ADA, a plaintiff must

8    show that she is a qualified individual with a disability and that a motivating factor in the

9    termination was her disability. *Dark*, 451 F.3d at 1085-86.  While courts have recognized

10   a distinction between termination of employment because of misconduct and termination

11   of employment because of disability, there is an important caveat. *Id.* at 1084.  With few

12   exceptions, conduct resulting from a disability is considered to be part of the disability,

13   rather than a separate basis for termination. *Gambini v. Total Renal Care, Inc.,* 487 F.3d

14   1087 (9th Cir. 2007); *Dark,* 451 F.3d at 1084; *Humphrey,* 239 F.3d at 1139-40.

15        One exception is the ADA's explicit authorization for discharge on the basis of

16   alcoholism and illegal drug use. *Dark*, 451 F.3d at 1084, FN 3.  An additional exception

17   "might" also apply in the case of "egregious and criminal conduct." *Id.* (citing *Newland v.*

18   *Dalton,* 81F.3d 904 (9th Cir. 1996)("Attempting to fire a weapon at individuals is the kind

19   of egregious and criminal conduct which employees are responsible for regardless of any

20   disability.")

21        Defendant cites A.R.S. § 13-1202 for its proposition that Plaintiff's statement to

22   Bowman was sufficiently egregious and criminal as to not be considered part of her

23   disability. Plaintiff's statement does not, however, fall under the statute.  Section 13-1202

24   provides, in pertinent part, as follows:

25        A.    A person commits threatening or intimidating if such person threatens or
              intimidates by word or conduct:

26

1          1.      To cause physical injury to another person...

2    A.R.S. 13-1202 (A).

3          In order to violate Section 13-1202(A), there must be a "true threat" i.e., a genuine

4    expression of intent to inflict bodily harm on another. *In re Kyle*, 200 Ariz. 447, 451, 27

5    P.3d 804, 808 (App. 2001).  In this case, Plaintiff had no intention of physically

6    assaulting Ms. Bowman [Plaintiff's statement of disputed facts ¶ 55; PSOF ¶¶ 115-119 ]

7    Therefore, Plaintiff did not violate the statute.

8          Plaintiff's words were also not sufficiently egregious to result in them not being

9    considered part of her disability. The *Gambini* case is instructive on this point.  In

10   *Gambini,* the plaintiff suffered from bi-polar disorder which caused her to experience a

11   "short fuse," "high energy," and "propensity to exhibit anger and irritability." *Id.* at 1091.

12   When her supervisor presented her with a performance improvement plan,

13        Gambini threw it across the desk and in a flourish of several profanities
          expressed her opinion that it was both unfair and unwarranted.  Before
14        slamming the door on her way out, Gambini hurled several choice
          profanities at Bratlie [the supervisor].  There is a dispute as to whether
15        during her dramatic exit Gambini warned Lovell [also a supervisor] and
          Bratlie that they 'will regret this," but Bratlie did observe Gambini kicking
16        and throwing things at her cubicle after the meeting.

17   *Id.* at 1091-1092 .

18         Shortly thereafter, Gambini was terminated.  Gambini sued and lost. On appeal,

19   the Ninth Circuit reversed and remanded, stating that:

20        [T]he jury was entitled to infer reasonably that her 'violent outburst' ... was a
          consequence of her bipolar disorder, which the law protects as part and parcel of
21        her disability. In those terms, if the law fails to protect the manifestations of her
          disability, there is no real protection in the law because it would protect the
22        disabled in name only.

23   *Id.* at 1094-1095.

24         The court further noted that Gambini was entitled to have a jury instructed that if it

25   found that her conduct at issue was caused by or was part of her disability, it could then

26   find that one of the 'substantial reasons' she was fired was her bipolar condition. *Id.*

1    Even if Defendant were correct about the Bowman incident, moreover, a jury

2    could reasonably conclude that any or all of the other alleged incidents of Plaintiff's

3    "Unsatisfactory and Unprofessional Conduct" that were listed as reasons for Chancellor

4    Glaspar's recommendation for Plaintiff's termination resulted from Plaintiff's disability.

5    As a result, a reasonable jury could conclude that Plaintiff was terminated at least in part

6    because of her disability.

7    **F.    Defendant Required Plaintiff To Undergo An Improper Medical Inquiry.**

8

9    In this case, Dr. Giovannini decided to recommend Plaintiff's termination <u>before</u>

10   Defendant undertook the two IMEs.  However, Plaintiff was not immediately terminated.

11   Instead, as Dr. Manlove testified, the termination was postponed because Defendant

12   needed some "meat" to go forward with it. [PSOF   ] As noted in *Dark,* an employer

13   would not need a fitness for duty evaluation to determine whether Plaintiff engaged in

14   misconduct. *Dark*, 451 F.3d at 1085.  A reasonable jury could conclude that Plaintiff's

15   alleged misconduct was a pretext for discrimination and that the IME were thus not

16   consistent with business necessity.

17   **G.    Plaintiff Has Not Requested Punitive Damages.**

18   In its Motion, Defendant claims that Plaintiff is not entitled to punitive damages in

19   this case.  Plaintiff agrees and has therefore not requested punitive damages.

20   **III.    Conclusion**

21   For all of the foregoing reasons, Menchaca respectfully requests that the Court

22   deny MCCCD's Motion for Summary Judgment.

23   RESPECTFULLY SUBMITTED this 8th day of September, 2008.

24   ROBAINA & PALOMINO, P.C.

25

26   By  s/: Edmundo P. Robaina
     Attorneys for Plaintiff Maria Denise Menchaca

20

**CERTIFICATE OF SERVICE**

I hereby certify that on September 8, 2008, I electronically submitted the attached document to the Clerk's Office using the CM/ECF system for filing and transmittal of Notice of Electronic filing to the following CM/ECF registrants:

A copy of the foregoing was mailed
this 8th day of September, 2008, to:

L. Eric Dowell
Leah S. Smith
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
2415 East Camelback Road, Suite 800
Phoenix, Arizona 86016

s/: Elizabeth Miramontes

21