**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Maria Denise Menchaca, | No. CV-07-1970-PHX-GMS |
| Plaintiff, | **ORDER** |
| vs. | |
| Maricopa Community College District, | |
| Defendant. | |

Pending before the Court is the Motion for Summary Judgment of Defendant Maricopa Community College District ("MCCD"). (Dkt. # 54.) For the following reasons, the Court grants the motion in part and denies the motion in part.

**BACKGROUND**

This motion stems from the termination of Plaintiff Maria Denise Menchaca's employment by MCCD and her subsequent suit under the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12300 (2005) ("ADA"). Menchaca was first hired by MCCD in August of 1990 to work as a student counselor at Estrella Mountain Community College. In December of 1991, Menchaca suffered a traumatic brain injury as a result of being involved in a car accident. She eventually returned to full-time work in August of 1992. For the next four years, she was under the treatment of Dr. Brady Wilson, a psychologist.

1    In May of 1993, MCCD notified Menchaca that it did not intend to renew her
2  employment contract.  Menchaca thereafter filed a charge of discrimination with the Equal
3  Employment Opportunity Commission ("EEOC"), asserting that MCCD was discriminating
4  against her on the basis of disability (specifically, her brain injury).  The parties entered into
5  a settlement agreement in May of 1994 whereby Menchaca released her claim and MCCD
6  renewed her employment contract and provided her with a job coach for nine months.  The
7  agreement required Menchaca to comply with MCCD's policies and procedures.

8    In 1995, Menchaca transferred to another of MCCD's campuses, Gateway
9  Community College ("Gateway"), to continue her work as a student counselor.  Her job
10 duties required her to work thirty-five hours each week, to teach four to seven credit hours
11 each semester, and to provide individual counseling to students.  The scope of Menchaca's
12 counseling duties included career counseling and academic planning, as well as personal and
13 crisis counseling.

14    In September of 2004, Menchaca became the subject of complaints that she shouted
15 at and spoke disrespectfully to a student during class.  Although the department chair, Dr.
16 RaNae Healy, provided some counseling to Menchaca regarding those complaints, Menchaca
17 eventually requested and was granted leave under the Family and Medical Leave Act
18 ("FMLA").  She resumed treatment with Dr. Wilson, who released her to return to work on
19 a part-time basis in late September of 2004.  Dr. Wilson recommended that Menchaca work
20 no more than fifteen to twenty hours each week, teach only one course, and not perform
21 counseling duties.  MCCD accommodated those recommendations.

22    In December of 2004, Menchaca requested that she return to full-time work, but asked
23 for additional accommodations based on the opinion of Dr. Wilson.  Dr. Wilson opined that
24 Menchaca suffered from a mental impairment (the traumatic brain injury, exacerbated by
25 unpredictable psychosocial stresses) which, by impairing her ability to regulate her emotional
26 responses, substantially limited one or more of Menchaca's major life activities.  Dr. Wilson
27 would later opine that "[t]he major life activity [Menchaca's impairment] limits essentially
28 is her interaction with life in the most general sense" (Dkt. # 52 Ex. C at 160), although Dr.

1   Wilson would go on to explain that Menchaca's symptoms interfere with "her ability to do
2   her work," "her ability to maintain her relationship," "her ability to maintain herself
3   physically, her home, her bills, her life activities," and her "ability to respond to all
4   conditions, not just specific conditions" (*id.*).   Dr. Wilson would further state that
5   Menchaca's mental impairment "limits her ability to function effectively," "to deal with [her]
6   stressors," and "to deal with things that might impact on anyone else's ability to work
7   effectively." (Dkt. # 52 Ex. C at 158-59.) Dr. Wilson also would note that Menchaca suffers
8   from posttraumatic stress disorder ("PTSD").   Based on his opinion, Dr. Wilson
9   recommended that Menchaca teach no more than four credit hours, teach only courses that
10  she had previously taught, have reduced counseling and administrative responsibilities, and
11  be provided with a job coach again.

12      On January 15, 2005, Menchaca met with Dr. Healy and the dean and associate dean
13  of student services in order to discuss Dr. Wilson's recommended accommodations and
14  Menchaca's return to full-time work.   MCCD agreed to limit Menchaca's counseling and
15  teaching duties and to have her teach only courses that she had previously taught.   MCCD
16  declined to provide a job coach, but offered to have Dr. Healy provide Menchaca with
17  feedback.   According to Menchaca, "it was made clear to me that it was this proposal or
18  nothing," (Dkt. # 58 Ex. A at 4-5 ¶ 37), so she agreed.  Dr. Healy eventually stopped meeting
19  with Menchaca given the demands of her own schedule, although Menchaca did not object.

20      Menchaca continued to work under these conditions throughout 2005. Due to several
21  issues in her personal and professional life, Menchaca described herself as becoming "an
22  emotional basket case" toward the end of that year.  (Dkt. # 52 Ex. A at 199.)  One of those
23  stressors was Dr. Healy's transfer out of the department.   Dr. Healy's replacement as
24  department chair was Denise Bowman.

25      On January 23, 2006, Menchaca met with Bowman to discuss Menchaca's job
26  responsibilities. Bowman reminded Menchaca of her responsibility to work thirty-five hours
27  each week, and noted that she had not done so the prior week.  Upon leaving the meeting,
28  Menchaca was, in her words, "distressed," "paranoid," and "totally stressed out," with an

1  "anxiety level [that] was off the charts."  (Dkt. # 52 Ex. C at 263.)  Several hours later,

2  visibly upset, Menchaca returned to Bowman's office.  She shouted at Bowman that if she

3  reported Menchaca's comings and goings to the administration: "I'll come back and kick

4  your ass."  (*Id.* at 265.)  Menchaca then left the office.  That evening, Menchaca called the

5  associate dean of student services to explain that she had experienced a "breakdown" (*id.* at

6  266) and that she was going to contact her psychologist, which she did the next day.  On

7  January 27, MCCD placed Menchaca on paid leave and asked her to submit to an

8  independent medical examination to assess her fitness for duty.  Menchaca agreed.

9       On March 6, 2006, Menchaca was examined by Dr. Daniel Blackwood, a

10  neuropsychologist.  Dr. Blackwood stated that Menchaca had no significant cognitive

11  impairment, and in response to the question of whether Menchaca has an impairment that

12  substantially limits one or more major life activities, Dr. Blackwood stated that "[t]he current

13  test results do not support the presence of any such impairment."  (Dkt. # 52 Ex. M at 6.)  He

14  further noted, however, that Menchaca had "some disturbances in behavioral control" and

15  explained that "Dr. Wilson may have some information which pertains to any possible

16  psychiatric impairment," which "might point to possible accommodations, as well, although

17  it would appear that the options would be limited and perhaps impossible, e.g., eliminating

18  all interpersonal contact for Dr. Menchaca at work."  (*Id.*)

19       Upon review of Dr. Blackwood's report, MCCD was unable to determine whether

20  Menchaca could perform her job.  It therefore requested that Menchaca submit to a second

21  examination, and she again agreed.  The second examination was conducted by Dr. Robin

22  Ford, a clinical psychologist, on April 28, 2006.  Dr. Ford concluded that Menchaca suffers

23  from a narcissistic personality disorder and that she is unable to function as a counselor

24  because "she lacks the empathy that's necessary to understand what a concerned or troubled

25  student might feel regarding that student's self or his or her future" and because "she might

26  find comments by a student as an occasion for anger and a more explosive reaction than the

27  student would deserve."  (Dkt. # 52 Ex. K at 198.)

28

MCCD then reviewed its other available positions. Because it determined that all such positions required student interaction, it concluded that there were no open positions for which Menchaca was qualified. Thus, Gateway's President, Dr. Giovannini, recommended to MCCD's Chancellor, Dr. Glasper, that Menchaca's employment be terminated. Dr. Glasper, in turn, made the same recommendation to MCCD's Governing Board. Menchaca requested a review hearing, and the Hearing Committee recommended (by a vote of two to one) that the Chancellor revoke that recommendation. The Chancellor declined to adopt the Hearing Committee's position and maintained his recommendation that the Governing Board terminate Menchaca's employment. The Board agreed with the Chancellor, and it terminated Menchaca's employment on February 27, 2007.

On October 12, 2007, Menchaca filed the complaint underlying this action. (Dkt. # 1.) She asserted four claims under the ADA: count one, failure to reasonably accommodate her disability; count two, failure to interact with her to reach a reasonable accommodation; count three, unlawful termination; and count 4, improperly requiring her to undergo medical examinations. (Dkt. # 1 at 7-8.) MCCD filed the instant motion for summary judgment on August 4, 2008. (Dkt. # 54.) The Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 (2006).

## DISCUSSION

### I.   Legal Standards

#### A.   Summary Judgment

Summary judgment is appropriate if the admissible evidence, viewed in the light most favorable to the nonmoving party, "show[s] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Jesinger v. Nev. Fed. Credit Union*, 24 F.3d 1127, 1130 (9th Cir. 1994). The moving party bears the initial burden of supporting its contention that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The burden is then on the nonmoving party to establish that a genuine issue of material fact exists. *See id.* Substantive law determines which facts are material, and "[o]nly disputes over facts that

1   might affect the outcome of the suit . . . will properly preclude the entry of summary

2   judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Similarly, the

3   dispute must be genuine; that is, the evidence must be "such that a reasonable jury could

4   return a verdict for the nonmoving party." *Id.*

5       **B.     The ADA**

6       The ADA provides that "[n]o covered entity shall discriminate against a qualified

7   individual with a disability because of the disability of such individual in regard to job

8   application procedures, the hiring, advancement, or discharge of employees, employee

9   compensation, job training, and other terms, conditions, and privileges of employment." 42

10   U.S.C. § 12112.  "[T]o establish a prima facie case of discrimination under the ADA[, a

11   plaintiff] must show that she: (1) is disabled; (2) is qualified; and (3) suffered an adverse

12   employment action because of her disability." *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237

13   F.3d 1080, 1087 (9th Cir. 2001).  "[W]hen an employee establishes a prima facie case of

14   discrimination because of a disability, and the employer provides a non-discriminatory

15   reason for that discharge which disclaims any reliance on the employee's disability in having

16   taken the employment action, the analysis developed in *McDonnell Douglas* . . . applies."

17   *Id.* at 1093.   Thus, the burden would shift to the employer to provide a legitimate

18   nondiscriminatory reason for the adverse employment action, and then the burden would shift

19   back to the employee to establish that the reason was merely pretext.  *See McDonnell*

20   *Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973).

21       "On the other hand, if the employer acknowledges reliance on the disability in the

22   employment decision, the employer bears the burden of showing that the disability is relevant

23   to the job's requirements." *Snead*, 237 F.3d at 1093 n.10.

24

25

26

27

28

1    **II.    Analysis**

2        MCCD advances five arguments in support of its motion for summary judgment: (A)

3    Menchaca is not disabled within the meaning of the ADA (Dkt. # 54 at 9-13); (B) Menchaca

4    is not a "qualified individual" under the ADA because she cannot perform the essential

5    functions of her job even with reasonable accommodation (*id.* at 13-17); (C) MCCD had a

6    legitimate, nondiscriminatory reason for discharging Menchaca (*id.* at 17-19); (D) MCCD

7    was entitled to have Menchaca submit to the challenged medical examinations (*id.* at 19); and

8    (E) Menchaca cannot establish the malice or reckless indifference required for recovery of

9    punitive damages (*id.* at 19-20).  The Court will address each argument in turn.

10        **A.    Disability Under the ADA**

11        MCCD asserts that Menchaca is not disabled under the ADA.  (Dkt. # 54 at 9-11.)

12    The ADA defines disability as: (1) a physical or mental impairment that substantially limits

13    one or more major life activities, (2) a record of having such an impairment, or (3) being

14    regarded as having such an impairment.[1]  42 U.S.C. § 12102.  "[T]he primary object of

15    attention in cases brought under the ADA should be whether entities covered under the ADA

16    have complied with their obligations, and . . . the question of whether an individual's

17    impairment is a disability under the ADA should not demand extensive analysis[.]"  ADA

18    Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553, § 2(b)(5).  Congress has

19    made clear that "[t]he definition of disability in [the ADA] shall be construed in favor of

20    broad coverage of individuals under [the ADA], to the maximum extent permitted by the

21    terms of [the ADA]."  *Id.* § 4 (to be codified at 42 U.S.C. § 12102(4)(A) (effective Jan. 1,

22    2009)).

23

24

25        [1]The parties offer arguments under all three prongs under which a person may be

26    deemed disabled for purposes of the ADA.  Because the Court concludes that Menchaca has
      raised genuine issues of material fact sufficient to survive summary judgment regarding an

27    impairment that substantially limits a major life activity, the Court need not address the

28    alternative theories of disability.

MCCD asserts that Menchaca is not disabled because she does not have an impairment that substantially limits a major life activity.  (Dkt. # 54 at 9-11.)  MCCD first argues that Menchaca cannot identify any major life activities that could be limited by her mental impairments of traumatic brain injury and PTSD.  MCCD seizes upon Dr. Wilson's statement that "[t]he major life activity [Menchaca's impairment] limits essentially is her interaction with life in the most general sense."  (Dkt. # 52 Ex. C at 160.)  MCCD asserts that "interaction with life" is too diffuse to constitute a recognized major life activity under the ADA.  (Dkt. # 54 at 9-11.)

However, Dr. Wilson offered much more than the vague assertion that Menchaca cannot "interact with life," as demonstrated by the sentences immediately following that statement:

> If the symptoms re-emerge, I'm going to say not only is it going to impact upon her ability to do her work, it's going to impact upon her ability to maintain her relationship.  And impact upon her ability to maintain herself physically, her home, her bills, her life activities.  It's not selective.  The impact of [traumatic brain injury] and PTSD is pervasive.  That is to say it [affects] a person's ability to respond to all conditions, not just specific conditions.

(Dkt. # 52 Ex. C at 160.)  Dr. Wilson further stated that Menchaca's mental impairment "limits her ability to function effectively," "to deal with [her] stressors," and "to deal with things that might impact on anyone else's ability to work effectively."  (Dkt. # 52 Ex. C at 158-59.)  Dr. Wilson also explained, more generally, that the essence of Menchaca's impairment is the inability to regulate her emotional responses when placed in stressful situations, which makes her prone to emotional outbursts of the kind that is the subject of this litigation.

Read in context, and in the light most favorable to Menchaca, Dr. Wilson's testimony is that Menchaca's mental impairment affects the major life activities of caring for herself ("impact upon her ability to maintain herself physically, her home, her bills"), working ("impact upon her ability to do her work"), and interacting with others ("impact upon her ability to maintain her relationship," "impact on anyone else's ability to work effectively").

1    These are all major life activities for the purposes of the ADA.  *See* ADA Amendments Act

2    § 4 (to be codified at 42 U.S.C. § 12102(2)(A) (effective Jan. 1, 2009)) ("[M]ajor life

3    activities include . . . caring for oneself . . . and working."); *McAlindin v. County of San*

4    *Diego*, 192 F.3d 1226, 1230 (9th Cir. 1999) (holding that the ability to interact with others

5    is a major life activity under the ADA).  Thus, Menchaca has sufficiently identified relevant

6    major life activities that could be limited by her impairment in order to survive summary

7    judgment.

8        MCCD also argues that Menchaca cannot show that her mental impairment

9    substantially limits those major life activities because "Dr. Wilson agreed with Dr.

10   Blackwood's conclusion, following his [medical examination] of Plaintiff, that Plaintiff did

11   not have any mental or physical impairment that substantially limited a major life activity."

12   (Dkt. # 54 at 10.)  However, Dr. Wilson did not, as MCCD claims, agree that Menchaca

13   lacked an impairment that substantially limited a major life activity.  In the deposition to

14   which MCCD refers, Dr. Wilson stated that "there's nothing in Dr. Blackwood's report that

15   I really take issue with" because his opinions "focus on a really different area of assessment

16   than my own assessment would as a clinician."  (Dkt. # 52 Ex. H at 8.)  A jury could

17   reasonably interpret that statement merely as pointing out the difference between the two

18   physicians' expertise, and not as an endorsement of Dr. Blackwood's conclusions.

19       Regardless, to the extent Dr. Wilson's statement could be construed as endorsing Dr.

20   Blackwood's ultimate conclusion on the matter, Dr. Wilson elsewhere testified to the

21   contrary:

22           [I]n regard to the first question, does she have a physical or
             mental impairment that substantially limits one or more major
23           life activities, I believe the answer is, at times.  And what I've
             testified to is that the effect of the traumatic brain injury, as well
24           as [PTSD] [d]oes – and permanently will lay at times dormant
             inside [Menchaca]. And depending upon situation stressors and
25           depending upon events, that can exacerbate the symptoms, it can
             emerge.  And when emerging, it significantly limits her ability
26           to function effectively.

27   (Dkt. # 52 Ex. C at 158-59.)  A jury could reasonably conclude from this testimony that Dr.

28   Wilson's opinion is that Menchaca does have an impairment that substantially limits her

1   major life activities when she is exposed to certain stressors.  To the extent that there is a

2   conflict within Dr. Wilson's testimony on this point, such a conflict would be for a jury to

3   resolve.

4          MCCD's final argument is that Menchaca's impairment is not a disability because it

5   is episodic.  However, "[a]n impairment that is episodic or in remission is a disability if it

6   would substantially limit a major life activity when active."  ADA Amendments Act § 4 (to

7   be codified at 42 U.S.C. § 12102(4)(D) (effective Jan. 1, 2009)).  There is ample evidence

8   in the record from which a reasonable jury could conclude that Menchaca's mental

9   impairment, when active (i.e., when she is subject to sufficient stressors), substantially limits

10  the major life activities identified above.  Menchaca's outbursts (and the consequences that

11  ensued) are circumstantial evidence that she cannot properly work or interact with others

12  when under the effects of her impairment, and Dr. Wilson provided direct evidence in the

13  form of his testimony that, when the impairing effects of Menchaca's traumatic brain injury

14  and PTSD emerge, "it significantly limits her ability to function effectively."  (Dkt. # 52 Ex.

15  C at 159.)  Thus, entry of summary judgment is not appropriate.

16          **B.    "Qualified Individual" Under the ADA**

17          MCCD argues that Menchaca is not a "qualified individual" under the ADA.  (Dkt.

18  # 54 at 13-16.)  "Qualified individual with a disability" is defined as "an individual with a

19  disability who, with or without reasonable accommodation, can perform the essential

20  functions of the employment position that such individual holds or desires."  42 U.S.C. §

21  12111(8).  Thus, the Court must first determine the relevant "essential functions" of

22  Menchaca's position and then evaluate whether she can perform those functions with or

23  without reasonable accommodation.

24          "Essential functions" are "the fundamental job duties of the employment position the

25  individual with a disability holds or desires."  29 C.F.R. § 1630.2(n)(1).  Here, MCCD

26  contends that "counseling and teaching students" and "perform[ing] . . . job duties safely and

27  without causing or threatening harm to others" are essential functions of Menchaca's job as

28

1  a student counselor.[2] (Dkt. # 54 at 13.) Menchaca does not dispute this aspect of MCCD's

2  motion; however, there remain genuine issues of material fact as to whether Menchaca can

3  perform those functions with the reasonable accommodation of a job coach.[3]

4      The reasonable accommodation standard is not high. "To avoid summary judgment,

5  [an employee] 'need only show that an "accommodation" seems reasonable on its face, i.e.,

6  ordinarily or in the run of cases.'" *Dark v. Curry County*, 451 F.3d 1078, 1088 (9th Cir.

7  2006) (emphasis omitted) (quoting *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401-02

8  (2002)). "As long as a reasonable accommodation available to the employer could have

9  plausibly enabled a handicapped employee to adequately perform his job, an employer is

10 liable for failing to attempt that accommodation." *Humphrey v. Mem'l Hosp. Ass'n*, 239 F.3d

11 1128, 1136 (9th Cir. 2001) (quoting *Kimbro v. Atl. Richfield Co.*, 889 F.2d 869, 879 (9th Cir.

12 1989)). Under this "minimal requirement," *id.*, Menchaca need only adduce sufficient

13 evidence from which a reasonable jury could find that an accommodation "could plausibly

14 have enabled [her] adequately to perform her job," *see id.*

15     MCCD first asserts that no reasonable accommodation – of any kind – was possible.

16 MCCD argues that Menchaca has "angry" and "emotional" outbursts that are neither

17 predictable nor controllable when she is confronted with stress. (Dkt. # 54 at 13-16.) As

18 MCCD points out, Menchaca herself agreed that her head injury "causes [her] to have angry

19 outbursts" (Dkt. # 52 Ex. A at 26) and that, when she is under stress, her symptoms include

20 "[t]he emotional – the – more the angry outbursts" (*id.* at 54). Menchaca further agreed that

21

22     [2]MCCD also states that "all faculty must act as role models and mentors to students."

23 (Dkt. # 54 at 13.)  However, MCCD does not actually contend that this is an essential
function of Menchaca's position, and thus the Court will consider it in the essentiality

24 analysis only in support of MCCD's arguments regarding "counseling and teaching students"
and "perform[ing] . . . job duties safely and without causing or threatening harm to others."

25 (*See* Dkt. # 54 at 13.)

26     [3]The parties also offer argument regarding whether transfer to other positions within

27 MCCD would have been a reasonable accommodation.  Because the Court is able to resolve
the reasonable accommodation inquiry under the parties' arguments regarding a job coach,

28 the Court will not reach this other argument.

1    "threatening behavior"[4] is one of the symptoms of her injury (*id.*), and that "it's unpredictable

2    what levels or types of stress will cause [her] symptoms to re-emerge" (*id.* at 131).  Both

3    Menchaca and her treating psychologist, Dr. Wilson, concurred that it is impossible to

4    identify what kind of stressors will cause her to have these outbursts.  (*Id.* at 134; Dkt. # 52

5    Ex. C at 159, 208-09.)  Menchaca also stated that she cannot control these symptoms, and

6    noted that she has "no way of knowing when they're going to happen and stopping [herself]

7    from doing it."  (Dkt. # 52 Ex. A at 138.)  On this basis, Dr. Wilson opined that Menchaca

8    should not be responsible for any crisis counseling.  (Dkt. # 52 Ex. H at 44.)  Indeed, Dr.

9    Blackwood, who conducted a fitness for duty examination on March 6, 2006, concluded that

10   if Menchaca suffered from an impairment, then "it would appear that the options would be

11   limited and perhaps impossible, e.g., eliminating all interpersonal contact for Dr. Menchaca

12   at work."  (Dkt. # 52 Ex. M at 6.)

13       Were Menchaca's argument that MCCD simply had to accept her behavior as a

14   reasonable accommodation, this would be a different case, for the Court is skeptical that an

15   employer could be forced to tolerate behavior of this nature in the absence of an

16   accommodation that would prevent it.[5]  However, Menchaca asserts that she was able to

17   perform the functions of her job in 1994-95, 1995-96, and 2005, during which times she

18   either had a job coach or was "working closely with Dr. Wilson" and "met with Dr. Healy,"

19

20   _____

21       [4]Menchaca, given some ambiguity on the point in MCCD's motion, offers an
     argument regarding whether her activity constituted a "direct threat" for the purposes of 42

22   U.S.C. § 12113.  (Dkt. # 58 at 16.)  MCCD clarifies in its reply that it is not asserting that
     Menchaca posed a "direct threat."  (Dkt. # 62 at 6-7.)  Menchaca agrees that "[i]f Defendant

23   is not suggesting that Plaintiff is a direct threat, then the question of whether Plaintiff is a
     qualified individual under the ADA turns on whether [MCCD] could have provided her with

24   an accommodation . . . ."  (Dkt. # 58 at 16.)  Thus, the Court will not address the "direct

25   threat" argument.

26       [5]MCCD seems to suggest that Menchaca is requesting that MCCD accept her

27   outbursts as part of its obligation to reasonably accommodate her.  (Dkt. # 54 at 15.)
     MCCD's citation to the record does not support the proposition that Menchaca requests such

28   an accommodation.  (Dkt. # 52 Ex. C at 159, 201-02, 208-09; Dkt. # 52 Ex. A at 134.)

1    who at one point told Menchaca that she was doing "fine." (Dkt. # 58 at 15.) Thus,

2    Menchaca argues that with the reasonable accommodation of a job coach (or the equivalent),

3    she can sufficiently control her outbursts to "perform [her] job duties safely and without

4    causing or threatening harm to others." While Menchaca's example of 2005 is somewhat

5    suspect – Menchaca described herself as an "emotional basket case" during that year (Dkt.

6    # 52 Ex. A at 199) and it was just one month later, in January of 2006, that Menchaca's

7    altercation with Ms. Bowman occurred – the evidence that Menchaca offers regarding the

8    other years is minimally sufficient to survive summary judgment. Viewing the evidence in

9    the light most favorable to Menchaca, it could be reasonably inferred from the fact that

10   Menchaca was retained through the months that she had a job coach that she could, in fact,

11   "counsel[] and teach[] students" and "perform [her] job duties safely and without causing or

12   threatening harm to others."

13        MCCD also advances specific arguments about the type of job coaching that would

14   be required, asserting that a job coach would not be a reasonable accommodation because:

15   (1) Menchaca "expected the job coach to assist her with . . . the very same skills Plaintiff was

16   responsible for teaching to her students," and (2) "the job coach would need to be a

17   permanent accommodation." (Dkt. # 54 at 16-17.) MCCD's first argument is a non sequitur;

18   the fact that Menchaca was teaching her students certain skills does not mean that Menchaca

19   would never need assistance in applying those skills in her own circumstances. MCCD

20   offers no authority, nor is the Court aware of any, that counsels in favor of such a result.

21   Under these circumstances, a job coach would not be an unreasonable accommodation

22   merely because that person would assist Menchaca with the same skills she is elsewhere

23   teaching to others. There remain questions of fact as to whether the accommodations sought

24   by Menchaca are reasonable in this regard.

25        As to MCCD's second argument, the sole case upon which it relies, *EEOC v. Dollar*

26   *General Corp.*, 252 F. Supp. 2d 277 (M.D.N.C.), is distinguishable on several grounds. In

27   *Dollar General*, the job coach did not merely provide assistive training to the employee, a

28   mentally disabled person, but actually performed certain functions of the job itself. *See id.*

1    at 280.  Specifically, the job coach "would be with [the employee] at all times while [the

2    employee] was working" and "if [the employee] could not perform a task independently, [the

3    job coach] would assist her in performing it."  *Id.*  In an ADA suit brought after the employee

4    was terminated, the employer argued that "the permanent or indefinite need for a job coach

5    most certainly is not a reasonable accommodation" because the ADA does not "permit an

6    individual to be characterized as a 'qualified individual' who requires that essential job

7    functions be performed by someone else" and because "the job coach in this instance went

8    far beyond 'coaching' and, in fact, performed [the employee's] limited job responsibilities."

9    *Id.* at 290.  The district court agreed, explaining that under those circumstances "a *full-time*

10   job coach *providing more than training* cannot be a reasonable accommodation, *id.* at 291

11   (emphases added).

12          In this case, unlike *Dollar General*, there is no evidence that the job coach Menchaca

13   requested as an accommodation would be a "full-time" position, would "provid[e] more than

14   training," or would actually perform Menchaca's work functions for her.  To the contrary,

15   Menchaca requested a job coach similar to the one she had been provided earlier.  (*See* Dkt.

16   # 58 Pt. 2 at 14 ¶¶ 62-63; Dkt. # 58 Ex. B at 101.)  Menchaca met with that job coach "almost

17   weekly" for "about an hour," and they would discuss Menchaca's activities and assist her

18   with goal-setting, decision-making, and communication skills.  (Dkt. # 58 Ex. B at 95-97.)

19   Thus, the accommodation Menchaca requested is in no way analogous to that in *Dollar*

20   *General*, and the fact that Menchaca's coaching might have continued on an ongoing basis

21   would not make the accommodation unreasonable as a matter of law.  Given the relatively

22   "minimal requirement" at issue, *Humphrey*, 239 F.3d at 1136, Menchaca has put forward

23   sufficient evidence from which a reasonable jury could find that the accommodation of a job

24   coach "could plausibly have enabled [her] adequately to perform her job," *see id.*

25

26

27

28

Summary judgment is therefore inappropriate under the "qualified individual" requirement.[6]

## C.    Termination Claim

MCCD argues that "Plaintiff's claims are subject to dismissal because [MCCD] terminated Plaintiff for legitimate, non-discriminatory reasons," specifically because she violated the Violence Policy by saying she would "kick [Bowman's] ass." (Dkt. # 54 at 17-19.)  MCCD acknowledges that the rule in the Ninth Circuit is that conduct resulting from a disability is considered to be part of the disability and is not a separate basis for termination, *see Humphrey*, 239 F.3d at 1139-40, and there is no dispute in this case as to whether Menchaca's statement resulted from her disability.

MCCD argues, however, that there is an exception for conduct that is "egregious and criminal."  MCCD's reliance on that phrase comes from the Ninth Circuit's decision in *Newland v. Dalton*, 81 F.3d 904, 906 (9th Cir. 1996).  In that case, a civilian employee

---

[6]MCCD presents some of its arguments regarding reasonable accommodation in an independent section on the subject, while others appear in the "qualified individual" section. The Court has addressed those sections together because both rest on whether a job coach is a reasonable accommodation.  To the extent MCCD is attempting to assert that the failure to establish that a job coach is a reasonable accommodation has other legal consequences, especially regarding count one of the Complaint, the Court rejects such an argument because (for the same reasons discussed above) there is a genuine issue of material fact as to whether a job coach would provide reasonable accommodation.

MCCD also discusses in this section all of the ways in which it did accommodate Menchaca.  It is unclear to the Court whether MCCD is simply providing a factual basis for its other arguments or is attempting to argue that this evidence defeats Menchaca's claim that MCCD failed to engage in the interactive process, for MCCD neither makes that argument explicitly nor provides any cases in support of such an argument.  In the absence of argument or authority, the Court will not reach that issue. *See Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929-30 (9th Cir. 2003) ("[W]e review only issues which are argued *specifically and distinctly*[.]") (emphasis added).

In the corollary section of its reply brief, MCCD argues (for the first time) that "the failure to engage in the interactive process is not an independent basis for relief." (Dkt. # 62 at 8 n.3.)  The Court will not consider arguments made for the first time in a reply brief, for the obvious reason that the opposing party has had no opportunity to respond. *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief.").

1   working at a military combat center was terminated after a "drunken rampage" in which he

2   attempted to fire an assault rifle at patrons in a bar.  *Id.* at 905.  The employee sued under the

3   precursor to the ADA, the Rehabilitation Act of 1973, arguing that: he was an alcoholic,

4   alcoholism is a disability, and his "drunken rampage" was the result of that disability.  *Id.*

5   Therefore, the employee argued, he had been improperly terminated because of his disability.

6   *Id.*  The Ninth Circuit agreed that alcoholism is a disability, and that misconduct causally

7   related to a disability is not a proper basis for termination, but nonetheless affirmed the

8   district court's dismissal of the complaint, reasoning that the employee's termination "was

9   not in retribution for his alcoholism but rather was in response to his attempt to fire an assault

10  rifle inside a bar."  *Id.* at 906.  The Ninth Circuit concluded by opining: "Attempting to fire

11  a weapon at individuals is the kind of egregious and criminal conduct which employees are

12  responsible for regardless of any disability."  *Id.*

13      The Ninth Circuit has since explained that "we have applied a distinction between

14  disability-caused conduct and disability itself as a cause for termination only in cases

15  involving illegal drug use or alcoholism."  *Humphrey*, 239 F.3d at 1140 n.18.  *Newland*

16  involved alcoholism, and thus its statement about "egregious and criminal conduct" is not

17  (under current Ninth Circuit law) an essential predicate to its holding.  Furthermore, the

18  Ninth Circuit has repeatedly declined to decide whether *Newland*'s concluding remark sets

19  out an exception or was merely a rhetorical flourish.  *See id.* ("In *Newland*, however, we

20  suggested that an additional exception *might* apply in the case of 'egregious and criminal

21  conduct' regardless of whether the disability is alcohol- or drug-related.") (emphasis added);

22  *Dark*, 451 F.3d at 1084 n.3 ("In [*Newland*] we suggested that an additional exception *might*

23  apply in the case of 'egregious and criminal conduct' regardless of whether the disability is

24  alcohol- or drug-related.") (emphasis added).

25      Despite the Ninth Circuit's reticence, MCCD insists that the exception applies and

26  that Menchaca's remark was criminal under Arizona Revised Statutes section 13-1202(A)(1)

27  (Supp. 2008) ("A person commits threatening or intimidating if the person threatens or

28  intimidates by word or conduct . . . [t]o cause physical injury to another person . . . .").

- 16 -

1    Violation of the statute MCCD identifies is a class one misdemeanor.  Ariz. Rev. Stat. § 13-

2    1202(B).  Menchaca, in response, disputes both the notion that the Ninth Circuit was

3    announcing a new, broad-based exception in *Newland* and that her conduct qualifies as

4    criminal conduct under section 13-1202(A)(1).

5         The Court need not decide either of these questions.  Even assuming that the Ninth

6    Circuit was articulating an exception, and even assuming that Menchaca's statement could

7    be termed criminal under section 12-1202(A)(1), that statement would not fall under the

8    exception because it must also be "egregious."  Egregious is defined as "extremely or

9    remarkably bad," *Black's Law Dictionary* 534 (7th ed. 1999), and "extraordinary, extreme,"

10   *Webster's Third New International Dictionary* 727 (2002).

11        As an initial matter, the Court notes that a number of factors indicate that the Ninth

12   Circuit, if it embraces the exception, intends for it to be applied narrowly.  Those indications

13   include *Newland*'s failure to expound upon the notion beyond a single sentence, the fact that

14   the exception is not essential to the court's holding, the Ninth Circuit's subsequent statements

15   that an exception has only been applied in cases involving drugs or alcoholism, and the Ninth

16   Circuit's ongoing hesitation to affirmatively sanction *Newland*'s ostensible exception.

17        In that light, the Court cannot say, as a matter of law, that Menchaca's statement in

18   this case was "egregious."  MCCD offers no argument on that point beyond describing the

19   circumstances of Menchaca's statement, and offers no rebuttal to Menchaca's explicit

20   argument that "Plaintiff's words were also not sufficiently egregious to result in them not

21   being considered part of her disability."  (Dkt. # 58 at 19.)  Although certainly improper and

22   offensive, a reasonable jury could conclude that Menchaca's statement was little more than

23   an off-the-cuff remark made in the heat of the moment, and not an "extraordinary" or

24   "extreme" act.  Nor does the nature of the crime it might constitute (in this case a

25   misdemeanor) counsel that the Court should term the conduct so egregious as to require entry

26   of summary judgment.

27        Furthermore, although no case has applied *Newland*'s suggested "egregious and

28   criminal conduct" exception (other than to find it inapplicable), the Court finds the Ninth

1    Circuit's decision in *Gambini v. Total Renal Care, Inc.*, 486 F.3d 1087 (9th Cir. 2007), to be

2    instructive because it provides a relevant set of circumstances to which the *Newland*

3    exception would not logically apply.   In *Gambini*, an employee suffered from bipolar

4    disorder, the symptoms of which began to interfere with her work and to concern her

5    coworkers.  *Id.* at 1091.  Three of the employee's supervisors eventually called her into a

6    meeting and presented her with a written improvement plan.  *Id.*  At that point in the meeting,

7    the employee began to cry, threw the plan across the desk, and "in a flourish of several

8    profanities expressed her opinion that it was both unfair and unwarranted."  *Id.*  Still cursing,

9    the employee stormed out of the office, allegedly warning two of the supervisors that they

10   would "regret this," slammed the office door, and began kicking and throwing things in her

11   cubicle.  *Id.* at 1091-92.  The employee was subsequently discharged, and she sued under a

12   provision of the Washington Law Against Discrimination analogous to the ADA.[7]  *Id.* at

13   1090, 1092.

14        At trial, the district court refused to give a jury instruction to the effect that conduct

15   resulting from a disability is part of the disability and not a separate basis for termination.

16   *Id.* at 1093.  The Ninth Circuit reversed, holding that the employee's "violent outbursts" were

17   "arguably symptomatic of her bipolar disorder" and that "the jury was entitled to infer

18   reasonably that her 'violent outburst' [at the meeting] was a consequence of her bipolar

19   disorder, which the law protects as part and parcel of her disability."  *Id.* at 1094.  Although

20   *Gambini* did not explicitly discuss *Newland*, *Gambini*'s statement that a jury could find this

21   type of behavior "protect[ed] as part and parcel of her disability," *id.*, is irreconcilable with

22

23   _____

24        [7]The rule at issue here – that conduct resulting from a disability is not a legitimate
     basis for termination – is the same under both Ninth Circuit ADA law and the Washington

25   law.  *See Riehl v. Foodmaker, Inc.*, 94 P.3d 930, 938 (Wash. 2004) ("Conduct resulting from
     the disability . . . is part of the disability and not a separate basis for termination.").  In fact,

26   the Washington Supreme Court incorporated that rule directly from the Ninth Circuit's
     caselaw.  *See id.* (citing *Humphrey*, 239 F.3d at 1139-40).  Thus, the Ninth Circuit's

27   application of this principle in the context of the Washington law is a proper indicator of the

28   Ninth Circuit's view of how the same principle would apply under the ADA.

1    *Newland*'s statement that "employees are responsible for [egregious and criminal conduct]

2    regardless of any disability," *Newland*, 81 F.3d at 906. Thus, the conduct in *Gambini* could

3    not be "egregious and criminal" as *Newland* used the term, for if such conduct were

4    "egregious and criminal" it could not be "protected."

5          Comparing the facts of *Gambini* and *Newland* to the circumstances presented here,

6    Menchaca's statement that she would "kick [Bowman's] ass" is plainly more akin to a

7    profanity-laced outburst containing a veiled threat than to an attempt to fire an assault rifle

8    at individuals in a bar. Since the Ninth Circuit concluded that such facts could be protected

9    as part of a disability, the facts here at least present an issue of fact sufficient to forestall

10   summary judgment. Therefore, under these specific circumstances, summary judgment is

11   not warranted.

12   **D.   Medical Examinations Claim**

13         MCCD argues that it was entitled to require Menchaca to submit to the two fitness for

14   duty examinations and thus that count four should be dismissed. (Dkt. # 54 at 19.) "A

15   covered entity shall not require a medical examination . . . unless such examination . . . is

16   shown to be job-related and consistent with business necessity." 42 U.S.C. §

17   12112(d)(4)(A). Menchaca does not dispute that the fitness for duty exams were job-related

18   (*see* Dkt. # 58 at 20), and the Court agrees that they were, *see Conrad v. Bd. of Johnson*

19   *County Comm'rs*, 237 F. Supp. 2d 1204, 1234 (D. Kan. 2002) (finding that medical

20   evaluations, including psychological tests, were job-related because they focused on the

21   employee's ability to perform her job functions); *see also Yin v. California*, 95 F.3d 864, 868

22   (9th Cir. 1996) ("There is no question that the proposed medical examination was job-related.

23   The record clearly indicates that Yin's supervisors had good cause for trying to determine

24   whether she was able to perform her job. . . . There is nothing in the record to suggest that

25   her supervisors were simply trying to discover whether she suffered from a particular

26   disability or that they harbored either a special bias against individuals with a given disability

27   or a general bias against all persons with disabilities.").

28

1    The only question before the Court, therefore, is whether the exams were "consistent

2    with business necessity." MCCD argues that they were because "Plaintiff made a threat of

3    physical violence against her supervisor." (Dkt. # 54 at 19.)  A medical exam to determine

4    whether or not a threat of violence will be carried out generally is consistent with business

5    necessity. *See Miller v. Champaign Cmty. Unit Sch. Dist.*, 983 F. Supp. 1201, 1206 (C.D.

6    Ill. 1997) (holding that a school district's requirement that a school employee submit to a

7    psychiatric examination was consistent with business necessity because the employee had

8    exhibited paranoid and anxious behavior, which fellow employees interpreted as

9    threatening).

10    Menchaca argues that the exams were not consistent with business necessity because

11    "Dr. Giovannini decided to recommend Plaintiff's termination *before* Defendant undertook

12    the two [exams]," "the termination was postponed because Defendant needed some 'meat'

13    to go forward," and "a reasonable jury could conclude that Plaintiff's alleged misconduct was

14    a pretext for discrimination . . . ." (Dkt. # 58 at 20.)  To the extent that Menchaca is arguing

15    that the subjective intentions of MCCD officials negated the business necessity of a medical

16    exam, the Court disagrees.  "The ADA's requirement that an [independent medical

17    examination] be consistent with business necessity is an objective one." *Tice v. Centre Area

18    Transp. Auth.*, 247 F.3d 506, 518 (3d Cir. 2001) (citing *Fitzpatrick v. City of Atlanta*, 2 F.3d

19    1112, 1119 n.6 (11th Cir. 1993)); *see also Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804,

20    813 (6th Cir. 1999) ("[T]here is no need to assess an employer's intent in ordering a fitness-

21    for-duty examination.").  The undisputed evidence in the record of Menchaca's behavior

22    while under stress, especially her statement that she would "kick [Bowman's] ass,"

23    establishes that MCCD was objectively justified in requiring a medical examination of

24    Menchaca's ability to work while subject to a mental impairment that caused her to threaten

25    others. *Cf. Yin*, 95 F.3d at 868 ("We conclude that when health problems have had a

26    substantial and injurious impact on an employee's job performance, the employer can require

27    the employee to undergo a physical examination designed to determine his or her ability to

28

1    work, even if the examination might disclose whether the employee is disabled or the extent

2    of any disability.").

3            To the extent Menchaca is arguing that she was actually terminated before the exams

4    occurred, that argument is factually incorrect.  There is no factual dispute regarding whether

5    the recommendation of Dr. Giovannini (or Dr. Glasper, for that matter) terminated her

6    employment.  The undisputed facts in the record establish that those officials, like the

7    Hearing Committee, merely made recommendations, either to other officials or to the

8    Governing Board; it was the Governing Board itself that terminated Menchaca's

9    employment.  Indeed, MCCD's statement of facts provides that it was the Governing Board

10   that terminated Menchaca's employment (Dkt. # 52 at 10 ¶ 65), and Menchaca does not

11   object to or counter that statement (*see* Dkt. # 58 Pt. 2 at 2-3).  Moreover, Menchaca's own

12   statement of facts provides that the Governing Board merely considered recommendations

13   and then issued the decision to terminate Menchaca's employment: "On or about February

14   27, 2007, Defendant's Governing Board, which did no independent investigation, reviewed

15   the Committee's Findings of Fact, Conclusions of Law and Recommendation, listened to oral

16   arguments from Plaintiff's and Defense counsel and upheld the Chancellor's

17   *recommendation* to terminate Plaintiff's employment."  (Dkt. # 58 Pt. 2 at 26 ¶ 138

18   (emphasis added).)

19           For these reasons, there is no genuine issue of material fact as to whether MCCD was

20   entitled to require the medical examinations.  Thus, summary judgment is appropriate on

21   count four.

22

23

24

25

26

27

28

1    **E.    Punitive Damages**

2    MCCD argues that Menchaca cannot establish a claim for punitive damages.  (Dkt.

3    # 54 at 19-20.)  Menchaca points out that she has not made such a claim, and she also agrees

4    that she is not entitled to punitive damages.  (Dkt. # 58 at 20.)  Thus, punitive damages are

5    not available in this case.

6    **CONCLUSION**

7    There are genuine issues of material fact on every aspect of Menchaca's claim, with

8    the exception of count four, on which summary judgment in MCCD's favor is appropriate.

9    **IT IS THEREFORE ORDERED** that MCCD's Motion for Summary Judgment

10   (Dkt. # 54) is **GRANTED IN PART** and **DENIED IN PART**.

11   **IT IS FURTHER ORDERED** that count four of the Complaint is **DISMISSED**.

12   DATED this 23rd day of January, 2009.

13

14                                        _____
                                          G. Murray Snow
15                                        United States District Judge

16

17

18

19

20

21

22

23

24

25

26

27

28